IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CATHERINE WILLIAMS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. H-11-1587 |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| COMMISIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND OPINION GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Before the Magistrate Judge[1] in this social security appeal is Defendant's Motion for Summary Judgment, Brief in Support, and Reply Brief (Document Nos. 9, 10 & 12), and Plaintiff's Cross Motion for Summary Judgment (Document No. 11). Having considered the cross motions for summary judgment, the administrative record, and the applicable law, the Magistrate Judge ORDERS, for the reasons set forth below, that the Defendant's Motion for Summary Judgment is GRANTED, Plaintiff's Motion for Summary Judgment is DENIED, and the decision of the Commissioner is AFFIRMED.

---

[1] The parties consented to proceed before the undersigned Magistrate Judge on July 19, 2011. (Document No. 8).

## I.    Introduction

Plaintiff Catherine Williams[2] ("Williams") brings this action pursuant to the Social Security Act ("Act"), 42 U.S.C. § 405(g), seeking judicial review of an adverse final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for supplemental security income ("SSI") benefits. Williams contends that the Administrative Law Judge's ("ALJ") decision is flawed because: (1) the ALJ's determination contains an error of law because it failed to address whether the plaintiff could hold and maintain employment for a significant period of time; and (2) substantial evidence does not support the ALJ's determination. The Commissioner, on the other hand, contends that (1) there is substantial evidence in the record to support the ALJ's decision; and (2) that the decision comports with applicable law and should therefore be affirmed.

## II.    Administrative Proceeding

On March 12, 2009, Williams applied for SSI benefits, claiming an inability to work as a result of spina bifida and seizures  (Tr. 131). Williams' claim was denied both at the initial and reconsideration stages. After that, Williams requested a hearing before an Administrative Law Judge ("ALJ"). The Social Security Administration granted her request and the ALJ, Gerald L. Meyer, held a hearing in Houston on October 7, 2009, at which Williams' claims were considered *de novo*. (Tr. 46). On January 20, 2010, the ALJ issued a decision finding Williams not disabled. (Tr. 43-55). At the first step, the ALJ found that Williams had not engaged in substantial gainful activity since the alleged

---

[2] The record indicates that Plaintiff's name is actually spelled Catharine Williams, but lower proceedings and pleadings have referred to her as Catherine so this opinion has adopted Catherine for consistency purposes.

onset of disability. (Tr. 48). At steps two and three, he found that Williams had a seizure disorder, an affective disorder and marijuana abuse by history, all of which are severe impairments within the meaning of the Act. The ALJ further found that Williams' impairments did not meet or equal the requirements of a listed impairment. (Tr. 48-50). At step four, the ALJ concluded that Williams had the residual functional capacity ("RFC") to perform a full range of medium work restricted to the extent that Williams could not climb ropes, ladders or scaffolding; could perform no work at unprotected heights or around dangerous machinery; and could only perform duties in a simple, routine work environment. (Tr. 50.) At step five, based on Williams's RFC, and the testimony of Cecile Johnson, a vocational expert, the ALJ, using the Medical-Vocation Guidelines as a framework, *see* 20 CFR Part 404, Subpart P, Appendix 2, concluded that Williams was not disabled because she could perform a full range of medium work with restrictions, including such jobs as a hospital cleaner, a kitchen helper, and a laundry worker, all of which are jobs that exist in significant numbers in the regional and national economy, and that she was, therefore, not disabled within the meaning of the Act. (Tr. 55).

Williams then asked for a review by the Appeals Council of the ALJ's adverse decision. The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings, or conclusions; or (4) a broad policy issue may affect the public interest. 20 C.F.R §§ 404.970, 416.1470. After considering Williams' contentions, in light of the applicable regulations and evidence, the Appeals

Council concluded, on March 25, 2011, that there was no basis upon which to grant Williams' request for review. (Tr. 1-3). The ALJ's findings and decision thus became final. Williams has timely filed her appeal of the ALJ's decision. 42 U.S.C. § 405(g). Both Williams and the Commissioner have filed Motions for Summary Judgment (Document Nos. 9 & 11). The Commissioner has filed a response to Plaintiff's Motion for Summary Judgment (Document No. 12). This appeal is ripe for ruling.

The evidence is set forth in the transcript, pages 1 through 491. (Document No. 4). There is no dispute as to the facts contained therein.

### III. Standard of Review of Agency Decision

The court's review of a denial of disability benefits is limited "to determining (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards."*Jones v. Apfel*, 174 F. 3d 692, 693 (5th Cir. 1999). Title 42, Section 405(g) limits judicial review of the Commissioner's decision: "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." The Act specifically grants the district court the power to enter judgment, upon the pleadings and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the case for a rehearing" when not supported by substantial evidence. 42 U.S.C. § 405(g). While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the Court may not "reweigh the evidence in the record nor try the issues *de novo*, nor substitute its judgment" for that of the Commissioner even if the

evidence preponderates against the Commissioner's decision. *Chaparro v. Bowen*, 815 F.2d 1008, 1009 (5th Cir. 1987); *see also Jones v. Apfel*, 174 F.3d at 693; *Cook v. Heckler*, 750 F.2d 391 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992) (quoting *Hemphill v. Weinberger*, 483 F.2d 1137 (5th Cir. 1973)).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence is "more than a mere scintilla and less than a preponderance." *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993) (quoting *Moore v. Sullivan*, 919 F.2d 901, 904 (5th Cir. 1990). The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choice' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983) (quoting *Hemphill v. Weinberger*, 483 F.2d 1137 (5th Cir. 1973); *Payne v. Weinberger*, 480 F.2d 1006 (5th Cir. 1973)).

## IV. Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving his disability. *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988). The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a

continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). The impairment must be so severe as to limit the claimant in the following manner:

> [She] is not only unable to do [her] previous work but cannot, considering [her] age, education and work experience engage in any other kinds of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.

42 U.S.C. § 423(d)(2)(A). The mere presence of an impairment is not enough to establish that one is suffering from a disability. Rather, a claimant is disabled only if she is "incapable of engaging in any substantial gainful activity." *Anthony*, 954 F.2d at 293 (quoting *Milan v Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)).

> The Commissioner applies a five-step sequential process to determine disability status:
>
> 1. If the claimant is presently working, a finding of "not disabled" must be made;
>
> 2. If the claimant does not have a "severe" impairment or combination of impairments, he will not be found disabled;
>
> 3. If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits are awarded;
>
> 4. If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made;
>
> 5. If the claimant's impairment prevents him from doing any other substantial gainful activity, taking into consideration his age, education, past work experience, and residual functional capacity, he will be found disabled.

*Anthony*, 954 F.2d at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991). Under this formula the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists. If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work. *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1990). Once the Commissioner demonstrates that other jobs are available, the burden shifts, again to the claimant to rebut this finding. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990). If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends. *Leggett*, 67 F.3d at 564.

Here, the ALJ found that Williams, despite her impairments and limitations, could perform medium work restricted only to the extent that she not climb ropes, ladders of scaffolding; perform no work at unprotected heights or around dangerous machinery; and, perform duties only in a simple, routine work environment. The ALJ further found that, even though Williams could not perform her past relevant work, she could perform other jobs such as a hospital cleaner, a kitchen helper, and a laundry worker, and that she therefore was not disabled within the meaning of the Act. As a result, the Court must determine whether substantial evidence supports the ALJ's step five finding.

In determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating, examining and consultative physicians on subsidiary questions of fact; (3) subjective evidence as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history, and present age. *Wren*, 925 F.2d at 126.

## V. Discussion

### A.  Objective Medical Evidence

The objective medical evidence shows that Williams suffers from spina bifida, a seizure disorder, an affective disorder, and marijuana abuse by history. (Tr. 48). According to the medical records, Williams suffered her first seizure on June 24, 2004. (Tr. 200).  Williams was treated with Cerebyx [3] by Dr. Joseph D'Adessio, and then discharged with a prescription of Dilantin after all of her vital signs improved to normal. (Tr. 205-06). Williams sought treatment again on August 25, 2004, because she "felt like she was going to have a seizure." (Tr. 273). She was treated, monitored and eventually released with a prescription for Dilantin. (Tr. 280). She returned to the hospital on September 11, 2004, because she was out of medication. (Tr. 290). Dr. Sarah Svoboda found "no symptoms present" and then gave her a prescription refill.[4] (Tr. 291). On December 17, 2004, Williams was in a motor vehicle accident. She received a head laceration and complained of head and cervical spine pain. (Tr. 306). She was diagnosed with a cervical strain, a scalp laceration and a head contusion. (Tr. 309). The laceration was repaired with staples, and Williams was released in stable condition. (Tr. 314). Williams had her staples removed on October 28, 2004, at Memorial Hermann. (Tr. 328). There were no complaints of pain at the time of her visit, and Williams was discharged in good condition after her staples were removed. (Tr. 331-32).

The medical record is absent any reports of seizures until August 12, 2008, four years after her last seizure. Williams had a seizure and was taken to Ben Taub General

---

[3] Cerebyx is an anticonvulsant manufactured by Pfizer.
[4] The record also contains several hospital visits concerning Dilantin adjustments, but no seizure activity, for her pregnancy occurring from to 12/12/06 - 2/27/2007 (Tr. 370-94)

Hospital. (Tr. 445). Williams was treated and prescribed Dilantin. Two months later, on

October 9, 2008, Williams had another seizure and was taken to Park Plaza Hospital for

treatment. (Tr. 427). Williams reported that she had taken her Dilantin as scheduled.[5] (Tr.

433). Williams was treated, given a prescription of Dilantin and discharged in stable

condition. (Tr. 437). On February 4, 2009, Williams had another seizure. (Tr. 487).

Williams stated that she had not taken her medication for three days prior to the incident.

(Tr. 487).

After Williams filed for benefits, she was examined by Dr. Stanley Zimmerman

at the request of the Texas Rehabilitation Commission on May 8, 2009. (Tr. 453).  He

reviewed x-rays of her spine taken May 1, 2009, which were normal (Tr.  456), and lab

results of Dilantin.  (Tr.  455.  The results of Williams's physical exam show:

> BP: 120/80, Height: 59 inches, and Weight: 78 pounds.
> The patient is a very thin African–American female.  The
> head is unremarkable.  Eyes: The pupils are equal, round
> and regular, react to light and accommodation.  The discs
> appear normal.  the ears, nose and throat are unremarkable.
> The neck is supple.  There is no adenopathy.  The thyroid is
> non-palpable.  The heart reveals a regular sinus rhythm.
> There are no murmurs and no enlargement.  The chest is
> clear to percussion and auscultation.  Abdomen: The liver,
> spleen and kidneys are non-palpable.  There are no masses
> and no tenderness.  Neurological: The cranial nerves are
> intact.  The deep tendon reflexes are equal bilaterally.
> There is no evidence of Rhomberg or Babinski.  There is
> no evidence of lumbar muscle spasm.  Flexion of the back
> was to 90 degrees.  The patient's gait is normal.  Visual
> acuity is 20/50 in each eye without glasses.  The patient's
> Dilantin level is 4ug/ml (10-20).  X-ray of the lumbar spine
> is unremarkable.  The patient is able to sit, stand, move
> about, lift, carry, handle objects, hear and speak without
> difficulty.  Patient's handgrip is 5/5 in each hand.  The
> patient is able to hear normal conversation without
> difficulty.  There is no evidence of edema or varicosities in
> the lower extremities.

---

[5] Lab reports indicated that her Dilantin levels were low. (Tr. 428).

> It is my impression that Ms.  Williams suffers from Epilepsy with Insufficient Levels of Dilantin, Spina Bifida by history and Headaches.  It is my impression that her description of her pain level being 9 on a scale of 0-10 is not consistent with her demeanor or her physical findings. (Tr.  454).

There are no medical records for back pain outside of the initial hospital visit after Williams's motor vehicle accident.[6]  (Tr.  306).  X-rays of the cervical spine were taken, and no acute abnormalities noted.  (Tr.  320).  There is no indication in the medical record that Williams has sought additional treatment for her back pain symptoms.

The medical records further show that Williams was referred to Community Counseling Associates for a mental status evaluation.  Williams was accompanied by her aunt.  The examination took place on April 27, 2009.  (Tr.  448-451).  Williams was evaluated by J.  Gregory Ryan, Psy.D.  With respect to Williams's appearance, behavior and speech, Dr.  Ryan noted:

> Catherine arrived on time for her scheduled appointment. She appeared her stated age, average height, and thin build. No problem with hearing was reported.  She stated she has vision problems but has not worn glasses in 10-years.  She was casually dressed and exhibited adequate personal hygiene and grooming.  Her eye contact was sustained and rapport was easily established.  No significant deficits in expressive and receptive language abilities were noted, although these were not formally evaluated.  There was no evidence of stuttering, stammering or related difficulties. Her rate and tone were within normal limits.  (Tr.  449-550)

As to Williams's memory, Dr.  Ryan wrote:

> Catherine demonstrated deficits with her immediate and long term memory.  When asked to repeat and remember three objects, "pen, glasses, and book," she was able to recall them immediately but unable to recall them after a

---

[6] Referring to the previously mentioned car accident that occurred on December 17, 2004.

> five-minute interval even with categorical prompts.  She
> reported the current president of the United States is "John
> McCain" and was unable to recall any other presidents.
> She was able to repeat one out of five digits forward and
> zero out of five digits backwards.  She was able to provide
> details about her life history.  (Tr.  450).

Dr.  Ryan also evaluated Williams's concentration and attention.  He observed:

> Catherine's concentration and attention appeared adequate.
> She was able to count 1-20 forwards and backwards
> although skipped one number in each category.   She
> incorrectly completed simple arithmetic problems, 8 +
> 7=16, and 12-8=3, however this maybe a lack of
> achievement abilities versus a deficit in concentration and
> attention.   She was able to pay attention throughout the
> interview aspect of the evaluation. (Tr.  450).

Williams's mood and affect was described as follows:

> Catherine's mood was depressed and affect was congruent.
> She reported feeling "depressed."  (Tr.  450).

As to Williams's thought process, Dr.  Ryan observed:

> She denied and exhibited no overt signs of delusions,
> hallucinations, or the presence of a thought disorder.  She
> demonstrated goal orientated and logical thinking.  (Tr.
> 450).

Finally, Dr.  Ryan evaluated Williams's judgment and insight.  He wrote:

> Catherine's insight appeared poor.  Her judgment appeared
> guarded.  When asked, "What would you do if you found a
> sealed, stamped, and addressed envelope?"  She replied,
> "Throw it away."  When asked, "What would you do if you
> saw a building with black smoke coming out?"  She
> replied, "Keep going."  (Tr.  450).

Based on the above results, Dr.  Ryan opined that Williams's had a depressive

disorder, NOS, and cannabis abuse.  She had a GAF score of 50.[7]  Overall, Dr.  Ryan

---

[7] A GAF score is a standard measurement of an individual's overall functioning level
with respect to psychological, social, and occupational functioning.  American
Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th Ed.
1994)(DSM-IV) at 32.  While a GAF score of 50 suggests "[s]erious symptoms... [or]

opined: "Catherine's current prognosis appears fair with consistent and effective mental health treatment.  She may benefit from vocational services."  (Tr.  451).

Also, in connection with her application for SSI, Williams's records were reviewed by Leela Reddy, M.D.  Dr.  Reddy completed a Mental Residual Functional Capacity Assessment (Tr.  457-460), and a Psychiatric Review Technique Form.  (Tr.  461-474).   As to the Mental RFC Assessment, areas that are evaluated include a claimant's understanding and memory, sustained concentration and persistence, social interaction, and adaptation.   Within each area, the evaluator considers the claimant's functional capacity as being "not significantly limited", "moderately limited", "markedly limited", "no evidence of limitation in this category" or "not ratable on available evidence."   With respect to understanding and memory, Dr.  Reddy opined that Williams was "markedly limited" in her ability to understand and remember detailed instruction.  In all other areas such as her ability to remember locations and work-like procedure and ability to understand and remember very short and simple instructions, Wiliams was "not significantly limited."   The next area addressed by Dr.  Reddy was Williams's sustained concentration and persistence.   According to Dr.   Reddy, Williams was "markedly limited" in only one area: her ability to carry out detailed instructions.   She was "moderately limited" in several areas: ability to maintain attention and concentration for extended periods; ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; ability to sustain an ordinary routine without special supervision; ability to work in coordination with or proximity to

serious impairment in social, occupational, or school functioning," DSM-IV at 34, a GAF score is not determinative of disability.  *See* 65 Fed.Reg.  50,746, 50,764-50,76565 (Aug. 21, 2000) (Commissioner declines to endorse the GAF scale for use is Social Security and SSI disability programs, and states that the GAF scale "does not have a direct correlation to the severity requirements in our mental disorders listings").

others without being distracted by them; and ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  Dr.  Reddy noted that Williams was "not significantly limited" in her ability to carry out very short and simple instructions; and in her ability to make simple work-related decisions.  The next area addressed by Dr.  Reddy was Williams's social interaction.  According to Dr.  Reddy, Williams was "moderately limited" in three areas: the ability to interact appropriately with the general public; the ability to accept instructions and respond appropriately to criticism from supervisors; and the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  Otherwise, Dr.  Reddy concluded that Williams had no significant limitations.  Dr.  Reddy found that Williams had the ability to ask simple questions and request assistance and was able to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  Finally, Dr.  Reddy considered Williams's adaptation.  As far as adaptation, Dr Reddy noted that Williams was "moderately limited" in only one area: the ability to respond appropriately to changes in the work setting.   In all other areas she was not significantly limited.  Dr.  Reddy opined that Williams had the ability to be aware of normal hazards and take appropriate precautions; ability to travel in unfamiliar places or use public transportation; and ability to set realistic goals or make plans independently of others.  Overall, Dr.  Reddy opined that Williams, based on her review of the records, could "understand, remember, and carry out simple instructions, make simple decisions, attend and concentrate for extended periods, interact with others, and respond to changes. (Tr.  459).

Lastly, Dr. Reddy completed a Psychiatric Review Technique. (Tr. 461-474). Dr. Reddy opined that Williams had a depressive disorder and cannibis abuse. Next, Dr. Reddy evaluated Williams's functional limitations in five areas: restriction of activities of daily living; difficulties in maintaining social functioning; difficulties in maintaining concentration, persistence, or pace; and episodes of decompensation, each of extended duration. The degree of functional limitations range from "none", "mild", "moderate", "marked or extreme". Here, Dr. Reddy opined that Williams had no episodes of decompensation. As to the other areas, she had "moderate" limitation in maintaining social functioning. Williams's degree of functional limitation was rated as "mild" in the following areas: restriction of activities of daily living and difficulties in maintaining concentration, persistence, or pace. (Tr. 471). Taking Dr. Ryan's finding's into account, Dr. Reddy opined that "[t]he objective medical evidence does suggest the presence of more than minimal limitations, but her ability to sustain basic work activity is not wholly compromised." (Tr. 473).

Upon this record, substantial evidence supports the ALJ's findings that, while Williams's impairments would be considered severe at step two of the analysis, the impairments did not meet or equal in severity a listed impairment. Additionally, the medical evidence weighs in favor of the ALJ's finding that Williams had the RFC to perform a wide range of medium work with restrictions, based upon the totality of the evidence. With respect to her allegations relating to her spine, the medical records show no abnormalities were noted on spinal x-rays and none were detected by Dr. Zimmerman during his examination. As to Williams's epilepsy, the objective medical evidence supports the ALJ's conclusion that it was controlled except when Williams was not

compliant with taking her prescribed medication and the therapeutic levels were low. Moreover, because of Williams's history of seizures, the ALJ concluded that she could not climb ropes, ladders or scaffolding or perform work at unprotected heights or around dangerous machinery. Finally, as to Williams's mental RFC, the ALJ made detailed findings in accord with listing 12.04, wherein he concluded Williams has a mild restriction in activities of daily living, moderate difficulties in social functioning, mild difficulties with regard to concentration, persistence or pace and no episodes of decompensation. Based on Williams's mental RFC, the ALJ restricted her to duties in a simple, routine work environment. The objective medical evidence weighs in favor of the ALJ's decision.

### B. Diagnosis and Expert Opinion

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact. Unless good cause is shown to the contrary, "the opinion, diagnosis, and medical evidence of the treating physician, especially when the consultation has been over a considerable amount of time, should be accorded considerable weight." *Perez v. Schweiker*, 653 F.2d 997 (5th Cir. 1981). For the ALJ to give deference to a medical opinion, however, the opinion must be more than a conclusion and must be supported by clinical and laboratory findings. *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Oldham v. Schweier*, 660 F.2d 1078 (5th Cir. 1981). Further, regardless of the opinions and diagnoses and medical sources, "the ALJ has sole responsibility for determining a claimant's disability status." *Martinez v. Chater,* 64 F.3d 172, 176 (5th Cir. 1995).

Here, there is very little relevant evidence of diagnosis or expert opinion. The doctor that treated Williams after her August 12, 2008, seizure advised her to continue normal activities, take her medication as prescribed, and not to drive. (Tr. 446). The ALJ also examined the medical record and addressed this lack of available relevant evidence of diagnosis or expert opinion in his evaluation. The ALJ wrote:

> [T]he record does not contain any opinions from treating or examining physicians indicating that the claimant is disabled or even has limitations greater then those determined in this decision. Given the claimant's allegations of totally disabling symptoms, one might expect to see some indication in the treatment records of restrictions placed on the claimant by the treating physician yet a review of the record in this case reveals no restrictions recommended by the treating physician.

(Tr. 53).

The ALJ did not err in his assessment of the medical opinions. The opinions of Dr. Reddy and Dr. Ryan support the ALJ's conclusion that Williams had the RFC to perform a limited range of medium work. As such, the diagnosis and expert opinion factor also supports the ALJ's decision.

### C. Subjective Evidence of Pain

The third element considered is the subjective evidence of pain, including the claimant's testimony and corroboration by family and friends. Not all pain is disabling, and the fact that a claimant cannot work without some pain or discomfort will not render her disabled. *Cook,* 750 F.2d at 395. The proper standard for evaluating pain is codified in the Social Security Disability benefits Reform Act of 1984, 42 U.S.C. § 423. The statute provides that allegations of pain do not constitute conclusive evidence of disability. 42 U.S.C. § 423. There must be objective medical evidence showing the existence of a physical or mental impairment which could reasonably be expected to

cause the pain. *Id.* Statements made by the individual or his physician as to the severity of the plaintiff's pain must be reasonably consistent with the objective medical evidence in the record. *Id.* Under the Act, pain is a disabling condition only when it is "constant, unremitting, and wholly unresponsive to therapeutic treatment." *Sellers,* 914 F.2d at 618–19 (citing *Harrell v. Bowen,* 862 F.2d 471, 480 (5th Cir. 1988)). Pain may also constitute a non-exertional impairment which can limit the range of jobs a claimant would otherwise be able to perform. *Scott v. Shalala,* 30 F.3d 33, 35 (5th Cir. 1994). The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALJ, who has the opportunity to observe the claimant. *Hames,* 707 F.2d at 166. Credibility can be discounted by inconsistencies in the record. *See Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995).

Williams claimed that she could not work due to spina bifida and seizures. (Tr. 131). Williams claimed that her condition does not affect her ability to take care of her hygiene. (Tr. 152). She reported that she is capable of washing dishes, preparing frozen dinners and shopping for clothes and food. (Tr. 153-154). In addition, she testified to daily activities such as watching television and taking care of her children. (Tr. 152, 155). She reported that she is often tired, frequently passes out, and that her depression causes her to prefer to be alone. (Tr. 153, 158). In addition to this, Williams claimed to have problems with authority because she "[doesn't] like people telling [her] what to do." (Tr. 157). She stated that she was fired from her most recent job because of problems getting along with customers, but at the hearing before the ALJ she stated that she was fired because she "moved too slow." (Tr. 17, 157). Williams also indicated that she had not used marijuana six months before her hearing, and that she only smoked it socially.

(Tr. 23).  However, she reported to Dr. Ryan that she had taken Prozac for her depression and smoked marijuana because "it was the only way [she] felt [she] could cope with life." (Tr. 449)

Williams' aunt, Sheila Jackson, also testified before the ALJ. She testified that Williams' seizures began after the car accident on December 17, 2004. (Tr. 25). She also testified that Williams must be told to take a bath, is not very responsible, and cannot take the bus on her own. (Tr. 25-26). Jackson reported that while Williams can pick out groceries on her own, she needs direction, is forgetful, and does not complete tasks unless constantly supervised. (Tr. 27-28, 33). Jackson testified that Williams's mother took drugs over the course of her pregnancy, and that in her opinion Williams was disabled as a result. (Tr. 32). Jackson also reported that Williams complained about her back as a child and that doctors told her that Williams had spina bifida. (Tr. 32). Finally, Jackson testified that she knew nothing about Williams' marijuana use, and did not allow drugs in the house, but guessed that she only did it to "get away" and "socialize." (Tr. 36-37).

The ALJ found Williams' subjective complaints not entirely credible. In addressing Williams's credibility, The ALJ wrote:

> Upon application, the claimant alleged that she is unable to work due to back pain and seizures (Ex 2E/1).  She alleged that she cannot lift much weight, can only walk around the block, takes longer than usual to finish projects, and keeps to herself.  She alleged that she cannot stand for long periods of time, is forgetful, and has difficulty sleeping.  However, she alleged that she takes care of her children, performs her personal care, prepares simple meals, washes dishes, is able to ride in a car and use public transportation, and is able to watch television shows with her children everyday (Ex 5E)  Sheila Jackson, the claimant's aunt, alleged that the claimant is unable to work due to seizures, depression, sadness, and frustration (Ex 5E/8).

The claimant testified that she is unable to work due to seizures that started in 2004.  She testified that she has tried to work several times but was told she was too slow and let go as a fast food worker.  She testified that she is not able to finish reading and writing, needs help to fill out applications, has problems with math, and needs help to count money.  She also testified that her last seizure was a couple of months ago and has headaches and dizziness.  However, she testified that she washes dishes and makes the bed.  She also testified that her last marijuana (sic) was six months ago, only does it socially, and does not buy any more because she has no money.

Sheila Jackson, the claimant's aunt, testified that the claimant started having seizures while working at Jack-in-the-Box, has to be told to take a bath, has never learned to drive, is not good at reading, cannot get on a bus on her own, and needs direction in a grocery store.  She testified that the claimant cannot work because her mother took drugs when she was pregnant with the claimant.  She testified that the claimant's last seizure was in 2009 and the claimant goes to the corner at night to smoke marijuana.

Turning to the medical evidence, the objective findings in this case fail to provide strong support for the claimant's allegations of disabling symptoms and limitations to the degree she alleged.  More specifically, the medical findings do not support the existence of limitations greater than those reported in the residual functional capacity assessment above.  Although the medical evidence shows that the claimant has a history of seizures as well as affective disorder, treatment records show a number of instances when the claimant subjectively reports no complaints and objective evidence documents several occasions of normal examinations with numerous periods of noncompliance with prescription medications.

Normal examinations (and no subjective complaints) are documented in the treatment records dated July 7, 2004 (Ex 3F/4-7), August 23, 2004 (Ex 4F/4-5), August 25, 2004 (Ex 5F/4-7), September 11, 2004 (Ex 6F/4-5), October 17, 2004 (Ex 7F/6-7), October 28, 2004 (Ex 8F/4), October 9, 2008 (Ex 11F/2-3), and a consultative examination dated May 1, 2009 (Ex 14F/3).  In support of the claimant's residual functional capacity to perform a wife range of medium work precluded from climbing ropes, ladders or scaffolding and work at unprotected heights or around dangerous machinery, a treating physician noted on August 12, 2008, that the claimant's seizures are well-controlled with Dilantin and advised the claimant to continue all normal activities but should do no driving (sic) (Ex. 12F/4-5 and 20F).

In addition to treatment records, acceptable imaging techniques include radiological findings dated May 1, 2009, showing a negative lumbar spine x-ray report (Ex.  14F/5).

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not generally credible to the extent they are inconsistent with the above residual functional capacity assessment.

In terms of the claimant's alleged limitations, the claimant's use of medications does not suggest the presence of an impairment which is more limiting than found in this decision.  There is evidence that the claimant has not been entirely compliant in taking prescribed medications, which suggests that the symptoms may not have been as limiting as the claimant has alleged in connection with this application.   This is documented in the following treatment records: June 24, 2004, non-compliant (Ex 1F), July 7, 2004, non-complaint (Ex 2F/6), July 18, 2004, non-compliant (Ex 3F/4-7), August 23, 2004, out of meds (Ex 4F/4-5), August 25, 2004, out of meds (Ex 5F/4-7), September 11, 2004, out of meds (Ex 6F/4-5), October 17, 2004, normal exam (Ex 7F/6-7), and February 04, 2009, out of medications again (Ex 20F/3).

The record reveals that the claimant failed to follow-up on recommendations made by the treating physician and continues to use unprescribed drugs, which suggests that the symptoms may not have been as serious as has been alleged in connection with this application and appeal.  This is documented on August 27, 2009, when the claimant reported that her last substance use was one month ago (Ex 13F/3).

Finally, the record does not contain any opinions from treating or examining physicians indicating that the claimant is disabled or even has limitations greater than those determined in this decision.  Given the claimant's allegations of totally disabling symptoms, one might expect to see some indication in the treatment records of restrictions placed on the claimant by the treating physician yet a review of the record in this case reveals no restrictions recommended by the treating physician.

In conclusion, the claimant's credibility is diminished by noncompliance with medical treatment, use of unprescribed drugs against medical advice, smoking against medical advice, no work history (Ex 20A), numerous prior appeals, and raising three young children without child support.

(Tr. 51-3).

There is nothing in the record to suggest the ALJ made improper credibility findings, or that he weighed the testimony improperly. There are inconsistencies between Williams's subjective complaints and the objective medical evidence. The ALJ identified the inconsistencies and gave specific reasons for rejecting Williams's subjective complaints, such as the use of non-prescribed drugs (marijuana) and non-compliance with medication instructions. Accordingly, this factor also weighs in favor of the ALJ's decision.

### D. Education, Work History, and Age

The final element to be weighed is the claimant's educational background, work history, and present age. A claimant will be determined to be under disability only if the claimant's physical or mental impairments are of such severity that she is not only unable to do her previous work, but cannot, considering her age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A). Vocational expert testimony provides substantial evidence for an ALJ's finding that a claimant can perform other work in the national economy only when it is based on a hypothetical question that include all limitations supported by the record. *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 2000)("The value of a vocational expert is that he [or she] is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed"). Beyond the hypothetical question posed by the ALJ, the ALJ must give the claimant the "opportunity to correct deficiencies in the ALJ's hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question). *Bowling*, 36 F.3d at 436.

The record shows that Williams was 31 years old at the time of the administrative hearing, had an 11th grade education (with special education classes), and had not worked since 2000 (Tr. 10, 12, and 133). The ALJ posed the following hypothetical to Ms. Cecilia Johnson, the vocational expert, during the hearing:

> Q. Well Ms. Johnson, would you assume for me a person who should never climb ropes, ladders or scaffolding … [n]o work at unprotected heights or around dangerous machinery, simple, routine work environment, would there be any work that would exist for a person who's 31 years old with an 11th grade education?
>
> A. Yes, sir. There's unskilled work. Do you want me to go to medium first and --
>
> Q. Whatever.
>
> A. Okay. Medium would be hospital cleaner, medium, unskilled, 323.687-010, 4,500 jobs state wide, 195,000 nationally. A second one would be that of a kitchen helper, 317.684-010, 7,000 jobs state wide, 275,000 nationally. A third one would be that of a laundry worker, 361.687-018, 6,000 jobs state wide and 240,000 nationally.
>
> Q. Does your testimony conform with the DOT?
>
> A. Yes, sir. It does.

(Tr. 37-38). Williams' attorney also questioned the vocational expert:

> Q. Considering those unskilled jobs that you --
>
> A. Yes, sir.
>
> Q. -- if you add that hypothetical the -- that individual would have a significant limitation, but not a marked -- it's not to the extent of a marked limitations, how would that impact on maintaining and keeping a job?
>
> A. Well, you need to go a little bit further of that. What do you mean by significant?
>
> Q. Significant limitation, but less than marked.
>
> A. And that's performing the job or getting to work on time?

Q. Performing the activities within a schedule and maintaining regular attendance and punctuality within customary tolerances.

A. They may have difficulty maintaining the employment.

Q. Same thing with sustaining an ordinary routine without special supervision, how would that affect the ability to maintain employment?

A. May have difficulty maintaining employment.

Q. And those jobs that you've mentioned, would they be jobs that have to be performed with other people, or by ones self? The reason I'm asking you, if the individual has significant difficulty in coordinating with others, and being distracted by other people, would that affect the performance of those jobs?

A. I really don't think so.

Q. Okay. Okay. And a significant limitation and ability to complete a normal work day and work week without interruptions, how would that impact the – maintain the keeping of those jobs?

A. Again, it may have difficulty in maintaining.

(Tr. 38-39).

Williams contends that this line of questioning proves that she may have difficulty in maintaining employment, and that not addressing this issue amounts to legal error. According to Williams, because she suffers from epilepsy with insufficient levels of Dilantin, and is moderately limited in the ability to maintain attention and concentration for extended periods, the ability to perform activities within a schedule, maintain regular attendance, and be punctual with customary tolerances, the ability to sustain an ordinary routine without special supervision, and the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and

length of rest periods, she is not able to hold or maintain employment.  This court disagrees.

Williams cites *Singletary v. Bowen* as the basis for her argument that she must be able to *hold* her job for a significant period of time. 798 F.2d 818, 822 (5th Cir. 1986). *Singletary*, however is distinguishable from the instant case. In that case, many treating physicians diagnosed the claimant as suffering from "serious, long-term mental impairments" that prevented Singletary from maintaining his employment. *Id*. at 820. Singletary was hospitalized many times for serious psychiatric problems, and doctors in that case also expressed concern about Singletary's employability. *Id*. at 823. In the instant case, however, there is nothing in the record from treating physicians indicating that Williams suffers from any serious, long-term mental impairments that affect her employability. In fact, outside of Williams mentioning to Dr. Ryan that she was hospitalized "for two weeks for depression and suicide" in her Psychological Evaluation (Tr. 449), there is a complete absence in the record of any hospitalizations or comments by treating physicians that her mental condition could affect her employability. There is also nothing in the objective medical record besides the aforementioned interview indicating that Williams had even been hospitalized for her depression. Dr. Reddy took her affective disorder into consideration when she found that Williams' ability to sustain basic work activity was not wholly compromised. (Tr. 473).

Additionally the Fifth Circuit Court of Appeals in *Frank v. Barnhart* narrowed *Singletary,* holding that the ALJ was not required to make a specific finding regarding the claimant's ability to maintain employment in every case. 326 F.3d 618, 619 (5th Cir. 2003). Rather, specific findings regarding the claimant's ability to maintain employment

are required only in "situation[s] in which, by its nature, the claimant's physical ailment *waxes* and *wanes* in its manifestation of disabling symptoms." *Id.* (citing *Watson v. Barnhart*, 288 F.3d 212 (5th Cir. 2002))(emphasis added). If the claimant does not make such a showing, the "claimant's ability to maintain employment is subsumed in the RFC determination." *Perez v. Barnhart*, 415 F.3d 457, 465 (5th Cir. 2005)(citing *Frank,*326 F.3d at 618.

In the instant case, Williams never claimed that any of her conditions wax or wane in their manifestations. In fact, the ALJ relied on the opinion of a state agency reviewing psychologist who opined that Williams has a "mild restriction in activities of daily living, moderate difficulties in social functioning, mild difficulties with regard to concentration, persistence or pace, and no episodes of decompensation" when he came to his decision. (Tr. 49). The questions at issue posed to the vocational expert by Williams were mere hypothetical assumptions, attempting to narrow her functional assessment. They were neither limitations contained in the RFC report, nor were they accepted by the ALJ. It has been long held that an ALJ is not bound to the testimony of a vocational expert if it is "based on a hypothetical question composed of  assumptions subsequently found unsupported by medical evidence." *Owens v. Heckler*, 770 F.2d 1276, 1282 (5th Cir. 1985). The ALJ made a logical conclusion that Williams was not disabled based on the testimony of the vocational expert and medical records. Based on the entire record, the undersigned finds that substantial evidence supports the ALJ's finding that Williams could perform medium work with the aforementioned limitations. All of the jobs identified by the vocational expert were consistent with Williams's RFC and are the types of jobs that could be performed based on medium work, given Williams's age,

level of education and stated limitations. Because the hypothetical questions contained all the functional limitations recognized by the ALJ, the Court concludes the ALJ's reliance on the vocational testimony was proper, and the vocational expert's testimony, along with the medical evidence, constitutes substantial evidence to support the ALJ's conclusion that Williams was not disabled within the meaning of the Act and therefore was not entitled to benefits. Further, it is clear from the record proper legal standards were used to evaluate the evidence presented. Accordingly, this factor also weighs in favor of the ALJ's decision.

## VI. Conclusion

Considering the record as a whole, the Court is of the opinion that the ALJ and the Commissioner properly used the guidelines propounded by the Social Security Administration, which direct a finding that Williams was not disabled within the meaning of the Act; that substantial evidence supports the ALJ's decision; and the Commissioner's decision should be affirmed. As such, it is

ORDERED Plaintiff's Motion for Summary Judgment (Document No. 11) is DENIED, Defendant's Motion for Summary Judgment (Document No. 9) is GRANTED, and the decision of the Commissioner of Social Security is AFFIRMED.

Signed at Houston, Texas, this 7th day of August, 2012

Frances H. Stacy
United States Magistrate Judge